BALTI-
MORE,
May, 1818.

United States
v.
Hare.

# CIRCUIT COURT, U. S.

## PHILADELPHIA, JUNE, 1818.

| *United States* | INDICTMENT FOR HAVING AIDED |
| vs. | AND ABETTED IN THE ROBBE- |
| *William Wood.* | RY OF THE MAIL, &c. |

·Present—Hon. *Bushrod Washington.*

. Hon. *Richard Peters.*

*C. J. Ingersoll*, District Attorney, Counsel for the United States.

*Z. Phillips*, Counsel for the Prisoner.

Mr. *Ingersoll* opened the cause to the jury, by detailing the facts that would be given in evidence, and con-

The convic-
tion of a per-
son for a crime
in the circuit

court of the United States, is the most conclusive evidence against an accessory, in another circuit, that such a crime was committed.

Putting the mail carrier in fear, and his life in peril or danger, is putting life in *jeopardy* within the meaning of the act of congress. The jurisdiction of the circuit court of the United States, in criminal cases, is confined to offences committed within the district for which those courts respectively sit, where they are committed on *land*.

Judgment arrested, because the caption of the indictment stated, " at a circuit court of the United States of America, in and for the Pennsylvania district :" it appearing the state of Pennsylvania had been divided, by an act of congress, passed subsequently to the presentment of the grand jury, but previously to the trial, into two districts, one called the eastern district of Pennsylvania, and the other the western district of Pennsylvania.

PHILAD'A,
June 1818.

United States
v.
Wood.

The attestation of the presiding judge is not necessary to the certificate of a record made by the clerk of a district court of the United States, that it is his certificate, or that the seal is that of the court, or that the record is in legal form: it is sufficient if the seal of the court is affixed to the record.

cluded by reading the law on which the indictment was founded. It is contained in the 19th and 21st sections of the act "regulating the post office establishment," passed April 20, 1810 :—"that if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death ; or if, in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy, by the use of dangerous weapons, such offender or offenders shall suffer death."—Sec. 19.

"That every person who shall procure, aid, advise, or assist in the doing or perpetrating any of the acts or crimes by this act forbidden to be done or performed, shall be subject to the same penalties and punishments as the persons are subject to who shall actually do or perpetrate any of the said acts or crimes, according to the provision of this act."—Sec. 21.

Mr. *Ingersoll* then offered the record of the conviction of John T. Hare and others, who were the principals in the mail robbery, and who were convicted at Baltimore.

Mr. *Phillips* objected to this conviction being received by the court, because there is no attestation of the presiding judge that the certificate attached to the record is that of the clerk; or that the seal is that of the court; or that the record is in a legal form. Also, that the record is on three distinct sheets of paper, not attached or connected together.

Mr. *Ingersoll.*—If this were a state court, and this re-

cord certified from one county to another, as it is, would
it be in form? That is the question, for the districts of
the United States are part of the same country, and not
foreign to each other. To require the certificate of the
presiding judge would end in nothing; for then you must
go farther, and get a certificate, if such a thing could be
had, that he is a judge of the circuit court, which would
be a difficult thing, as the judges of the supreme court are
not commissioned circuit judges. Besides, the circuit
judge does not appoint the clerk, and probably never sees
his commission. All he knows is the acting of the clerk
*ex officio*, and possessing and using the seal of the court.

As to the second objection, Mr. Ingersoll observed,
that the record is written in the same hand, and is con-
nected in the matter from sheet to sheet, and there is no-
thing in it that can for a moment make the court doubt
that it is not the entire record. It is for the court to say,
from an examination of it, whether they believe it to be
one record.

Mr. *Phillips.*—This record is signed by P. Moore,
and it is impossible for this court to know, judicially,
that P. Moore is clerk of the court whence the record
issued; he gives the only evidence that he is a clerk
which the court will not allow. The danger of accept-
ing a record of this kind would be very great, and
might lead to very serious frauds, for it would be an easy
matter for a man to sign himself clerk, and step into the
clerk's office when he was absent, and attach the seal to
a certificate that he was clerk. In executing commissions
in *civil caess*, the greatest strictness is observed and re-
quired; and where the record consists of more than one
piece of paper, every sheet is marked and numbered, and
attached together. The same strictness should be ob-

PHILAD'A.
June, 1818.

United States
v.
Wood.

PHILAD'A.   served in *criminal cases*, particularly where the life of
June, 1818.  the man is the forfeit in case of conviction.

United States   Mr. Phillips also objected, that it was not certified to
    v.        be a full exemplification of the record.
  Wood.

The Court overruled the objections. As to the first objection, there is no law which requires such a certificate. The act of congress of the 26th May, 1790, (1 vol. 115.) does not apply to the records of the federal courts; and even as to the records of the state courts, that act does not require a certificate of the judge that the person attesting the record is clerk. It is sufficient in this case that the seal of the court is affixed. Were it the record of a state court, the certificate of the presiding judge that it was done in due form would be necessary.

As to the other objection, it is by no means fatal to the evidence, although it is certainly improper to certify records in the way that this is, in sheets unconnected by some fastening. But if the court, upon inspection, is satisfied (as we are in this case) with the verity of this record, that is sufficient.

Mr. *Ingersoll* then read the conviction of John Alexander and others, indicted for robbing the mail, from the record of the circuit court in Baltimore. He then called the following witnesses.

## EVIDENCE.

*Owen Churchman*, affirmed.—In consequence of information left at my counting house by Mr. Baily, I was going to see him; on my way I met Wood, the prisoner and another (by the name of Davis) conversing together, I followed them down to Water-street, Davis went into a slop-shop; I spoke to an acquaintance to watch Wood, and went into the shop to watch Davis; he showed no money; I went out and waited. I had not been out many minutes, when a boy came out of the slop-shop with a note, and went into Mr. Pritchett's store. (The note was payable to the order of Churchman and Thomas.) Wood also went into Pritchett's store, I followed him and the boy in; Wood asked the price of flour; I caught him and sent word to have Davis secured. We took them to Mr.

PHILAD'A.
June, 1818.

United States
v.
Wood.

Baily's office, and thence to Alderman Bartram's. When I first saw Davis and Wood, supposing them to be the men described by Mr. Baily, I followed them and saw a paper pass from Wood to Davis. When at the alderman's, Wood refused to give any account of the manner by which he became possessed of the money; he said he was an honest man. The alderman told him if he was honest, he would not refuse to give an account of the money. Wood replied, "If this answer will do, I found it [the note] near the market-house in Callowhill-street." I assisted in stripping him, and found a pistol in a belt under his waistcoat. He acknowledged giving the note to Davis.

A statement had been made by Mr. Ducker, (a broker) of the manner in which the note had been presented to him; he said that Wood had been two or three times at his office, and had sold him parcels of North Carolina money; that the last time he was there, he presented this note, (the one he had endeavoured to pass charged in the indictment) that he, Ducker, discovered that it was payable to Churchman and Thomas, and wanted their names to make it negotiable, and asked him whether he was one of the firm; he replied that his name was Churchman, and that he was from Baltimore; that Ducker then said, if he was one of the firm, and would endorse the note, he would purchase it; that Wood seemed confused, and walked out. Wood said in the alderman's office, that all which Mr. Ducker had stated was correct, and acknowledged being in prison before in Philadelphia and Baltimore.

*Cross-examined*—There were a number of persons in the office, about twelve or fifteen. I do not recollect any particular conversation about the robbery of the mail; if Wood was charged with robbing the mail I do not recollect it; it must have been when I was not near enough to hear. I stated that this note must have come from the mail, but I do not recollect any particular charge, that Wood had robbed the mail. He said he was in the city when the mail was robbed, and he brought a witness who swore that he had lodged with him on the night of the mail robbery, he then called himself Alexander.

*Chester Baily* sworn.—I first saw the fellow to the pistol at Havre-de-Grace. I went there on the 13th March, after hearing the mail was robbed. After the information I received from Mr. Ducker, I got a written description of Wood from him, and sent it throughout the city. Churchman came in a short time after, with Wood and Davis; I immediately saw that Wood was the man I had given a description of. We went with the prisoner to alderman Bartram's office; the first thing done was to search Wood, and the pistol was found on him; I observed to the alderman that this was the match to the pisol found at Havre-de-Grace. I sent for the pistol; it was forwarded by mail. Wood was asked some questions about the note; he said the note belonged to him, and not to Davis. I asked him where he got it, and if he got it honestly he would tell; he said he got his money as honestly as I got mine, and afterwards he said he found it in the street.

*David Bell* sworn.—I saw this note enclosed in a letter at Charleston, S. C. and put it in the post office; it was directed to

PHILAD'A.
June, 1818.

United States
v.
Wood.

Churchman and Thomas. The endorsement is my father's. There were forty $100 notes enclosed in the letter.

*John Ducker* sworn.—About 9 o'clock of the morning that Wood was apprehended, he sold me a $100 note on the State Bank of N. Carolina. At the middle of the day he offered me some other notes, about $57, for which I did not offer enough; I wanted 40 per cent. discount. He said he must consult his brother; he stept out and then came in and agreed to sell me the notes; they were Somerset notes, of Maryland; I bought them; he then offered me this note; I asked him if he was one of the firm, he said his name was Churchman, of Baltimore. I gave this statement before the alderman; Wood said it was correct, and the alderman entered his acknowledgment on the docket.

*Furman Black* affirmed.—I am one of the keepers of the prison. Some day last week a gentleman called at the prison and wanted to see Wood; I went to the cells with the gentleman to see him; the gentleman addressed him by the name of Wood or Alexander, and asked him if he would do him the justice to give him an order for some money that was in the hands of Bartram. Wood observed that he had nothing to do with the robbery of the mail, that the money he got exchanged he received from John Alexander, and returned the proceeds to him; he then stated the money was found with Alexander behind the looking glass, and it was the identical money which was the proceeds of the notes he exchanged for Alexander.

*Mr. Ingersoll* here read the following order for this money, which was signed by the prisoner:

I hereby authorize Mr. J. A. Isaacs to receive of George Bartram, Esq. the sum of three hundred and thirty nine dollars, fifty cents, which was found in my possession, and taken by the officer who executed the process under which I was arrested, and which were the proceeds of Mr. John M. Patton's check on the Philadelphia Bank, or if the said money should not now be under the control of the said George Bartram, Esq. I authorize any person who may have the control of it, to pay the same to the said Isaacs.

(Signed,)          WILLIAM WOOD.

May 27th, 1818.

Witness present, Seth Price.

*Thomas Hare* sworn.—About the 27th of February last Wood and myself started from Baltimore; we arrived here the 3d or 4th of March; when we came here I understood that Joseph and Lewis Hare were in the city; I found them—Joseph, at John Alexander's and Lewis, at a house near there. Lewis came down to John Alexander's, and they told me about this plot of robbing the mail, which was to be executed as soon as Joseph's feet got well, which were sore by travelling. I do not recollect whether Wood was there at that time or not. They asked me if I knew who had pistols; I told them Wood had; I asked Wood to let them have his pistols; he refused at first, and then consented to lend them. These look like the pistols; they were brass barrels; I never had them in my hands but once or twice; I think they received the pistols the day before they started. Sunday morning previous to the robbery John Alexander, Lewis Hare, Joseph T. Hare, W. Wood, and

myself, started from Alexander's house; we went into Arch street, and went up Arch-street, as far as 10th or 11th street, when Wood and myself returned, the others went on to rob the mail, as they said; I returned to Alexander's house, and Wood went down town. On the Friday following, John Alexander returned, and said he had completed the business, and had received about 4,000 dollars. The next day Wood came to Alexander's; the conversation again took place about the mail robbery; Alexander told Wood that he had got about 4,000 dollars from the mail, as his share; and gave Wood a post note of 100 dollars; he said he did not know much about the note, but he would give it to him, that he expected it was good. I do not know whether this is the note; I gave him a 100 dollars note also. Alexander gave him the note as a present, or as a compensation for the loan of the pistols. Wood was present when the pistols were cleaned; I took one to pieces to clean it.

Cross examined.—I believe the plan to rob the mail was made before Wood and I came from Baltimore. I knew nothing of it until I came from there. John Alexander or Joseph Hare first told me of it. I think it was Joseph, they all talked to me about it. I think I mentioned to Wood first, that they were going to rob the mail, but am not certain. Wood did not advise against it. I was not to go with them; Lewis wanted me to go, but Joseph did not want me. The three that went were to divide the spoil. I was to receive none. I did not state in my examination that I was taken sick, and returned on that account. I stated that I was unwell when it took place. Mrs. Alexander was opposed to the plan. I received two notes from Alexander, one of 100 dollars, and one of 10 dollars. I gave one of 100 dollars to Johnson, and one of 100 dollars to Wood. Joseph and Lewis Hare are my brothers. Joseph is the oldest—Lewis is younger than I am. I saw Wood whilst the three were absent; he lodged in the same house with me for two or three nights. I do not know what part Wood took but lending his pistols. He was not invited to go; they thought three were enough. Lewis said he would rather have me than Alexander, as he was afraid Alexander would tell of them, and he did not know Alexander. I made the disclosure to Mr. Bache; my motives were, Mr. Bache said he would favour me all he could. What induced me was for the sake of liberating my brothers. I supposed if I was not admitted as a witness, John Alexander would be, and we all three should be convicted, as John Alexander was present. I had not been acquainted a long time before with Wood. I formed an acquaintance with him at Baltimore. I heard of the mail robbery before Alexander came up. It was understood that the mail was to be robbed when Wood lent the pistols. I informed him when I asked him for them.

*T. W. Ludlow* sworn.—Gave the same evidence as on the trial of the three principals convicted at Baltimore.

D. Boyer, the mail carrier, was also sworn, and testified as in the former trial.

*John M. Patton* affirmed.—On the morning of the day he was taken prisoner, Wood offered me 350 dollars on the state bank of N. C. I exchanged the notes for him, and paid him in a check on Philadelphia Bank; after I paid him he left the office. I sold the

PHILAD'A,
June 1818.

United States
v.
Wood.

PHILAD'A.
June, 1818.

United States
v.
Wood.

notes to H. M. Prevost. When I found the notes were taken from the mail I went to Mr. P. to take a minute of the marks and numbers of the notes, which he did also.

*Richard Bache* sworn.—I accompanied Wood to prison, to have him searched; he protested that he had nothing to do with the robbery of the mail, and refused to tell me at that time where he·got the 100 dollar note that he had given Davis to pass. He told me that·he lived at Deal's tavern, up sixth-street, and afterwards that he resided at Mr. Black's. I went to him the morning after he was committed to prison, and told him the object was not so much to punish the offenders, as to obtain the money robbed from the mail, and I urged him to tell me where it could be found; he denied knowing any thing about it, and told me I might as well rob the mail as to take the money which he said he became possessed of lawfully. At the magistrate's he said that he worked on the turnpike, and received the note in payment for work done on the road. After Hare and Alexander had made a confession, I was of opinion, that a fourth person had been engaged on the spot in the robbery, as the four horses had been taken from the mail waggon, and as the sum which Alexander acknowledged to have been his portion, was so much smaller than that found on the persons detected at Baltimore. I went to the prison, therefore, and had Alexander, Wood and Thomas Hare brought out of their cells into the entry. Alexander there stated, that Wood knew of the robbery, and that when he came from Baltimore, he gave him the money which he had taken from the mail to exchange; that he went along with him to the broker's office in fourth-street, (Mr. Ducker's) that he stood at a distance and gave Wood the money, which when exchanged, Wood returned the proceeds to him. Alexander said, that he had given the 100 dollar note to Wood for himself; Wood did not deny any thing that Alexander said, but when Alexander assured me that there were but three persons actually engaged on the spot in the robbery, Wood observed that we had Alexander's confession that there were but three concerned, and he hoped we did not want to hang more than the three. I told him to be on his guard; and that persons concerned in aiding and abetting would share the same punishment as the principals. At a previous time, when I pressed him to tell me where the money was, and that it would be·a serious matter to him if he did not disclose the facts, he said that he was not afraid, that no person concerned in the robbery could be admitted as a witness against him, because they had all been convicted; that Davis, who informed against him, was a convict, and that Alexander and Thomas Hare were both convicts; to which I replied, that Hare had been pardoned. Wood remarked to me, that Alexander had told me he had given up all the money, and he asked me why I suspected him. Alexander told me that he had placed the money, (the proceeds of that which Wood exchanged) behind the looking glass. He did not state that Wood was to have a share in the plunder, but he said that the reason why Wood and T. Hare did not accompany them was, that they concluded three were enough; and if there were more, there would be greater difficulty in escaping detection.

The prisoner offered no evidence.

*Mr. Ingersoll*, the District Attorney, contended, that the evidence in relation to all the counts which are not capital, was conclusive; whether the other counts were proved would depend upon the meaning which the court and jury might give to the word *jeopardy*, in the 19th section of the law. With respect to the term *jeopardy*, he observed that the legislature used a word for which we can recur to no code of laws for a definition. We are obliged to inquire of dictionaries for its meaning. This is the first step of departure from that precision which the law exacts in a criminal case. Dr. Johnson derives it from the French *J'ai perdu—I have lost*—and defines it *peril, danger;* I should rather derive it from *Je perde—I lose*—and define it extreme peril or danger, equivalent to, *it's all over, I am lost*, or the like. When a loaded pistol is presented with a threat to discharge it, the man aimed at may be in *fear*, as the driver of the mail says he was; and he may be in *danger* too, but not that *extremity* of danger which this word calls for. If the pistol had been fired, and missed or snapped, I should consider the life in jeopardy by the use of the dangerous weapon; but I doubt whether a mere menace to use a loaded pistol or naked dirk, can be considered as within the law; and it would be especially severe to apply the strongest meaning of a *doubtful* word, in an accessorial case like this, where the accused was not at the place of perpetration.

In short, my difficulty is this: the word is doubtful, and the case is capital. Like the word *revolt*, therefore, on which this court had refused to settle a judgment of conviction in a capital case, it appears to me that the prosecution is liable to be defeated by the mere doubt-

PHILAD'A.
June, 1818.

United States
v.
Wood.

PHILAD'A. June, 1818.

United States
v.
Wood.

fulness of the word used by the legislature. The best idea have met with, of what strikes me as the true use of jeopardy, is to be found in the Bible, in the 18th verse of the 5th chapter of Judges: "Zebulun and Naphtali were a people that jeoparded their lives *unto death*, in the high places of the field." Here the word means a danger of an extreme degree, approaching close to death, and such I suppose the word *jeopardy*. Perhaps the idea is a refinement. But such as it is, I think proper, after some reflection, to state it, and under the impression of at least the questionableness of the term. I shall not press that part of the case which calls for the offender's life, when it is perfectly clear upon the testimony and the law, that he is guilty of that crime which is not capital.

Mr. *Phillips*, for the prisoner, stated, that as the prosecution upon the counts which charge the prisoner with a capital offence was given up, he should submit the prisoner's case upon the other counts to the jury.

Judge Washington informed Mr. Phillips, that the court did not entertain the doubt which the district attorney had expressed as to the meaning of the word *jeopardy*, and that it was proper to apprize him of this in order that he might defend his client in like manner, as if no concession had been made, or doubt expressed, by the district attorney.

The counsel still submitted the case to the jury under the charge of the court.

*Judge Washington* then delivered the following charge:

The first inquiry for the jury is, whether the mail carrier was robbed of the mail, and if he was, whether it

was effected by putting the life of the carrier in jeopardy by the use of dangerous weapons, or otherwise.

The conviction of Joseph T. Hare, John Alexander, and Lewis Hare before the circuit court of Maryland, and the sentence of the court thereon, is evidence the most conclusive against the prisoner, that the crime for which those persons were severally convicted was committed by them. This is confirmed by the testimony of Boyer the mail carrier, and Mr. Ludlow the passenger.

As to the nature of the offence of which Joseph T. Hare, &c. were convicted, the court does not entertain a doubt. We think that putting the mail carrier in fear, and his life in peril or danger, is putting his life in jeopardy, within the meaning and intent of the act of congress, and if the jury should be of opinion, under the circumstances which attended this transaction, that Boyer was in fear, and in danger of his life, the offence of those principals was capital. We think it our duty to give you this opinion, notwithstanding the concessions which the candor of the district attorney induced him to make. We do not, however, think it necessary or proper in this case to press this point against the prisoner; and with these few observations which have been made, I leave this point to the jury.

The next question is, whether the prisoner did aid, advise, or assist in the perpetration of a crime committed by the principals?

If Thomas Hare, who has given testimony on the part of the prosecution, is believed by the jury, he has clearly proved that the prisoner not only participated in the plan formed for robbing the mail, and aided its execution by his countenance and advice, but that he lent his pistols

PHILAD'A.   to the principals, with a distinct knowledge of the crimi-
June, 1818.  nal purpose for which they were borrowed ; and that he
United States accompanied the perpetrators of the crime a short dis-
    v.       tance on their journey to the place of its intended exe-
  Wood.      cution.   In addition to the testimony of this witness, Mr.
Bailey has proved the exact similtude of the pistol found
upon the prisoner at the magistrate's, and that found at
Havre-de-Grace, near to the spot where the robbery was
committed.

Should the jury be of opinion that the prisoner is
guilty of the offence charged against him as capital, ac-
cording to the explanation of the law given by the court,
they may find him generally guilty.   If they should
think him guilty of assisting only in a simple robbery
of the mail, or that the life of the mail carrier was not
in jeopardy, according to the meaning of that word as
given by the court, then they will find him guilty on the
3d or 4th count, and not guilty of the others.   If they
think him not guilty of any offence, they will find him
not guilty.

The jury retired at half past three o'clock, and at five
returned with a verdict of guilty.   On being called over
and asked separately, one of them dissented from the ver-
dict given in ; after some observations from the court they
again retired, and at half past six o'clock brought in a
verdict of *guilty.*

*Motion in Arrest of Judgment and for a New Trial.*
—The prisoner being brought before the court to receive
sentence of death, Zalegman Phillips, Esq. his counsel,
moved for a new trial, and in arrest of Judgment, as
follows:

The defendant by his counsel, Zalegman Phillips, assigns the following as reasons for a new trial :

1st. That the verdict is against law and against evidence.

2d. That the jury have convicted the defendant capitally, *to wit:* on the first, second, fourth, and fifth counts of the indictment, when the attorney of the United States expressly stated to them, that he did not ask a conviction on those counts, as he considered the law very doubtful, and would be satisfied with a conviction on the third and sixth counts of the indictment, and that in consequence thereof the prisoner's counsel did not enter into any examination of the law and facts in his behalf, as applying to the said mentioned counts, believing them to have been abandoned by the attorney of the United States.

3d. That the jury have mistaken the law and the facts, and have considered that the fact of John Alexander and Joseph Thompson Hare having been guilty of *"robbing the mail, by putting the life of the carrier in jeopardy by the use of dangerous weapons,"* was not only sufficient, but obligatory on them to convict the defendant capitally, from the single circumstance of the defendant's having lent his pistols ; the jury not having distinguished between aiding and assisting to commit the robbery, as described in the first branch of the 19th section, and aiding and assisting to commit the robbery, by putting the life of the carrier in jeopardy by the use of dangerous weapons, as described in the second branch of the said 19th section, which are distinct and separate offences, and which were laid in distinct and separate counts in the indictment.

PHILA'DA,     4th. That evidence was admitted to go to the jury, to
June, 1818.
             wit : a paper called a record of a court, which in point of
United States law was inadmissible.

v.
Wood.                               Z. PHILLIPS, for defendant.

*Motion in Arrest of Judgment.*—Defendant, by his
counsel, Zalegman Phillips, assigns the following as rea-
sons in arrest of Judgement :

1st. That the caption of the indictment states, a circuit
court of the United States of America, in and for the
Pennsylvania district, to have been holden at the city of
Philadelphia, when in fact and in law, there is no such
district of Pennsylvania.

2d.. That the indictment is the presentment of a grand
inquest, styled and called the grand inquest of the United
States, inquiring for the Pennsylvania district ; when in
fact and in law there is no such district as the Pennsylva-
nia district ; the state of Pennsylvania having been divid-
ed by an act of congress, passed previously to the present-
ment of the grand inquest, into two districts ; one called
the eastern district of Pennsylvania, and the other, the
western district of Pennsylvania.

3d. That the defendant is charged in the indictment
with procuring, aiding, advising, and assisting in the
doing and perpetration of the robbery of the mail of the
United States, without stating that the said offence was
committed by putting the life of the mail carrier in jeo-
pardy by the use of dangerous weapons.

4th. That it is no where stated in the indictment that
the defendant procured, aided, advised, or assisted in the
doing and perpetration of the robbery of the mail of
the United, States, by putting the life of the mail carrier

in jeopardy by the use of dangerous weapons; which of-
fence alone is made capital.

5th. Manifest errors.

The case was elaborately argued on Friday, 5th June,
by Mr. *Phillips* for the prisoner, and Mr. *Ingersoll*, the
district attorney, for the United States; and on Saturday
the court delivered the following decision:

*Washington J.*—This is a motion in arrest of judg-
ment, and various causes have been assigned; but as the
decision of the court will be given on the two first, it will
be unnecessary to state the others.

These were, 1st, (see the first reason in arrest of judg-
ment,) 2d, (see the second do.)

The first objection then is to the style of the court,
which, it is contended, should be the circuit court for the
eastern district of Pennsylvania; this change being pro-
duced by the act of congress "to divide the state of Penn-
sylvania into two judicial districts," passed on the 20th
April, 1818.

It is not contended that the style of the court is alter-
ed in express terms, but it is supposed to arise necessarily
from the division of the state and the jurisdiction assign-
ed to the western court. There might be some colour
for this argument, if the law had created a new circuit
court for the western district, in which case, there would
seem to be a propriety, at least, in distinguishing that
court from this, by calling that the *western*, and this the
*eastern* circuit court. But it will appear from a correct
analysis of the law, that the style of the western court is
the *district court* for that district, in contradistinction to
the *district court* for the eastern district, and that the di-
vision of the state into two districts is in reference to those
courts.

PHILAD'A,
June, 1818.

United States
v.
Wood.

PHILAD'A,    The title of the act is, "an act to divide the state of
June, 1818.  Pennsylvania into two judicial districts."

United States    Sec. 1. Divides the state of Pennsylvania into *two*
v.           *districts*, and designates their respective boundaries.
Wood.        Certain counties shall compose one district, to be called
the western district, and the residue of the state shall
compose another district, to be called the eastern district,
and the terms of the *district court* for said eastern district
shall be held at Philadelphia, and the terms of the *circuit
court* for the western district shall be held at Pittsburg.*

Sec. 2. Richard Peters, Esq., now judge of the district
of Pennsylvania, is assigned as the judge to hold the
courts in the eastern district, and to do all things apper-
taining to the office of a district judge, under the constitu-
tion and laws of the United States.

Sec. 3. The president is to appoint a district judge for
the western district, and he shall do and perform all such
duties as are enjoined on or in any wise appertaining to
a district judge of the United States.

Sec. 4. The circuit court shall be held for the eastern
district at Philadelphia, at the time and in the manner
now directed by law, to be held for the district of Penn-
sylvania, and the district court for the western district, in
addition to the ordinary jurisdiction and powers of a
district court, shall, within the limits thereof, have juris-
diction of all causes, except of appeals and writs of er-
ror, cognizable by law in a circuit court, and shall pro-
ceed therein in the same manner as a circuit court, and
writs of error shall lie to the circuit court in the said

---

* The only express appellation of the circuit court for the western
district is to be found in this clause, which fixes the place of holding the
circuit court and the terms at Pittsburg.

eastern district, in the same manner as from other district courts, to their respective circuit courts.

PHILAD'A,
June, 1818.

United States
v.
Wood.

Sec. 5. The president to appoint the district attorney and marshal for the western district; the district attorney and marshal for the district of Pennsylvania, to be district attorney and marshal respectively for the eastern district.

Sec. 6. Directs how *civil* causes shall be removed, and in all its terms has reference to *civil* causes, and to the *district court* for the western district.

It is true, that the word circuit is used in the first section in connexion with the western court; but the other parts of the law show, most obviously, that this was an inaccuracy of expression, since in every other section it is styled a district court. It has not only the style and jurisdiction of a district court, but it is subordinate to the circuit court in the eastern district, in the same manner as other district courts are *to their respective circuit courts.* It is true, that the western district court has the same jurisdiction assigned to it as is exercised by the circuit court. But this circumstance does not constitute it a circuit court.

The second objection to the caption is, that it states the presentment to be by the grand jury of the United States, inquiring for the district of Pennsylvania, when in truth there is no such district, and the jury had no power to inquire except for the eastern district.

The answer to this objection is, that the caption is consistent with the truth of the case, and would therefore have been faulty had it been qualified as the prisoner's counsel has contended it ought to have been. The *venire* issued before the passage of the law in question, to summon the grand jury for the district of Pennsylvania,

PHILAD'A, June, 1818.

United States v. Wood.

and on the 11th of April, some days before the passage of this act into a law, they were sworn and affirmed to inquire for the body of the district of Pennsylvania. The indictment, therefore, is with strict propriety found by the grand inquest of the United States, inquiring *for Pennsylvania district* upon oath and affirmation, inasmuch as they were legally sworn and affirmed to inquire for the whole district.

Nevertheless, there remains to be considered under this head, a very interesting question, which is, does this indictment show that this court has jurisdiction of the offence charged to have been committed by the prisoner? This question resolves itself into two others. Although the grand jury were sworn and very properly to inquire for the district of Pennsylvania, yet could they, after the passage of this law, inquire of offences committed on land out of the eastern district of Pennsylvania: and if they could not, then secondly, does the indictment sufficiently show that the offence of which the prisoner stands convicted, was committed within the jurisdiction of the court..

The court has not been able to find any act of congress, which in express terms fixes the jurisdiction of the circuit courts in criminal cases, by the place in which the offence was committed.

But the court is clearly of opinion, upon the fair and reasonable construction of the different laws upon this subject, that the jurisdiction of the circuit court in criminal cases, is confined to offences committed within the district for which those courts respectively sit where they are committed on land. See the 11th, 23d, and 29th sections of the first judicial act, and the 3d section of the act of the 2d March, 1793, vol. ii. p. 225.

It was contended by the district attorney, that the ju-

risdiction of the western district court does not extend to criminal cases; but the court cannot give its assent to this construction of the law. The 4th section declares that that court, in addition to the ordinary jurisdiction of a district court, shall, within the limits of the western district, have jurisdiction of all *causes*, except appeals and writs of error cognizable by law in a circuit court. Now, as it is clear that a circuit court has jurisdiction of all offences prohibited by the laws of the United States committed at sea or on land, within the district where the court sits, it follows, from the general expressions above quoted, that the western district court has the cognizance of offences limited as to jurisdiction as the the circuit courts are.

2. If then this court has not jurisdiction of offences committed within the western district, and the western court has, the next question is, does this indictment sufficiently show that the offence of which the prisoner is convicted, was committed within the jurisdiction of this court? The allegation in all the counts is, that the offence was committed *at the district of Pennsylvania.* It might then have been committed as well in the western as in the eastern district, and the court cannot help the indictment in this respect by any presumptions, or because we know from the evidence that the offence was committed in this city. It is indispensable that the indictment should distinctly show that the court has jurisdiction of the offence, and it ought, therefore, to have laid it to have been committed in the eastern district. And since it might be proper in some cases of a capital nature to try the cause in the county where the offence was committed, there would seem to be a propriety in stating the county

PHILAD'A,
June,1818.

United States
v.
Wood.

For the law
upon this sub
ject, see vol.
1. p. 330. 515.

also in the indictment, though on this point we give no positive opinion at this time, the case not requiring it.

Upon the whole, we are of opinion, that the judgment must be arrested for the reason which has been stated.